**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

OMAR ASHANTI JOHNSON, CLARENCE JONES, and ALEXANDER CASTILLO,

Plaintiffs,

v.

LATOYA HUGHES, in her individual capacity and official capacity as Director of the Illinois Department of Corrections; MATTHEW PLUMMER, in his individual capacity and official capacity as the Day-to-Day Warden at Menard Correctional Center; ANTHONY WILLS, in his individual capacity as the former Warden of Menard Correctional Center; BRITTANY GREENE, in her individual capacity as Deputy Director of Region 2 at the Illinois Department of Corrections; ANGELA LOCKE, in her individual capacity as Former Deputy Director of Region 2 at the Illinois Department of Corrections; MAC-SHANE FRANK, in his individual capacity as the Assistant Warden of Operations at Menard Correctional Center; KEVIN REICHERT, in his individual capacity as the Former Assistant Warden of Operations at Menard Correctional Center; TONYA KNUST, in her individual capacity as the Former Assistant Warden of Programs at Menard Correctional Center,

Defendants.

Civil Action No. 26-cv-00267-NJR
Jury Demand

Judge Nancy J. Rosenstengel

**FIRST AMENDED COMPLAINT**

## NATURE OF THE ACTION

1. The ability to exercise is a constitutionally protected basic human need, just like food, water, and warmth. And just like food, water, and warmth, exercise is not a luxury or privilege that must be earned, or that can be coercively withheld from an incarcerated person. Yet, that is exactly what has been systematically perpetrated against the Plaintiffs.

2. Plaintiffs Omar Johnson, Clarence Jones, and Alexander (Alex) Castillo are three of the many individuals who have been held for extended periods of time in solitary confinement at Menard Correctional Center ("Menard")—a maximum-security prison in the Illinois Department of Corrections ("IDOC") notorious for its inhumane conditions of confinement—and who have been systematically deprived of almost any exercise, and in many cases, all but the most minimal ability to move their bodies.

3. Access to exercise and out-of-cell time for incarcerated individuals is protected under the Eighth Amendment to the United States Constitution, which prohibits the infliction of cruel and unusual punishment. The prolonged deprivation of the right to exercise causes severe physical deterioration, psychological harm, and suffering that cannot be justified.

4. Plaintiffs have endured multiple periods of prolonged solitary confinement in North House Unit 2 ("North 2" or "N2"), the principal restrictive housing unit at Menard. During their time in N2, each Plaintiff has been denied yard time—and the fresh air and opportunity to stretch their limbs and exercise that it affords—for months or even a year at a time.

5. In N2, the Plaintiffs were confined in cells that were so small that Plaintiffs could not fully extend their arms, and that were far too cramped to allow for meaningful body movement, much less exercise. Plaintiffs could not even do a push-up or jumping jack without bumping into the bunk or the wall. These cells fail to meet established national correctional standards for cell size and, in some cases, even the minimum size of 50 square feet required by Illinois law.

6. Further limiting the Plaintiffs' ability to observe their constitutional right to exercise, their cells were filthy, unventilated, degraded, covered in black mold, and lacking any natural light, fresh air, or view of the outside world. Their cells reeked of feces, urine, and smoke, and sewage regularly seeped through the cells. In summer, the cells were sweltering; in winter, they were freezing. Rust covered every metal surface. The conditions of confinement were toxic and created a further barrier to exercise.

7. Each of the Plaintiffs wanted to exercise and move their bodies. But even if the size of their cells had allowed it, the conditions made it nearly impossible for Plaintiffs to exercise in their cells.

8. This denial of the right to exercise is no accident. Defendants have employed specific policies and practices that resulted in Plaintiffs being confined without movement in these dungeon-like conditions for months on end.

9. Defendants systematically refuse to run yard—outdoor recreation—for people in N2 for extended periods of time. They also prevent people in North 2 from accessing any alternative forms of indoor recreation, gym, exercise, or out-of-cell activities.

10. Defendants "stack" consecutive disciplinary terms and stints on investigative status that extend segregation terms. In doing so, they recklessly disregard how such stacking results in the long-term denial of exercise and out-of-cell time, as well as the physical and mental harm to the prisoners—including Plaintiffs—who are or have been housed in N2.

11. Additionally, Defendants consistently impose "pink tag" or a similar status on N2 prisoners—including Plaintiffs Johnson and Castillo—upon their placement in the unit, which further strips them of yard access.

12. Defendants also regularly subject Plaintiffs and others in N2 to arbitrary administrative lockdowns, further limiting their ability to leave their cells and move their bodies.

13. The consequences of these policies and practices for Plaintiffs and others like them have been devastating.

14. Healthcare and correctional experts universally recognize the importance of outdoor exercise for people in prison. Daily communal exercise and recreation are critical for human health, safety, and well-being, particularly during prolonged isolated confinement. Lack of adequate outside exercise in the open air can inflict grave physical and psychological harm. The physical harms include hypertension, heart problems, muscular atrophy, painful contractions of large muscles, weight loss, aggravation of preexisting conditions, and the development and exacerbation of depression, anxiety, and other mood disorders. The psychological effects include anxiety, hypersensitivity, anger, obsessive thoughts, cognitive disturbances, post-traumatic stress disorder, loss of identity, and psychosis.

15. Over the 30 months he has been at Menard, Mr. Johnson has spent a total of 375 days in North 2, during which time Defendants denied him even a minute of yard time. Despite his desire and attempts to exercise, Defendants' policies and practices have made doing so virtually impossible. As a result, Mr. Johnson has suffered severe and progressive physical and mental deterioration. His joints have stiffened, he has chronic lower back pain, he has developed high blood pressure, and he has lost substantial muscle mass due to atrophy. As a lifelong athlete, Mr. Johnson has felt depressed and anxious as a direct consequence of being constantly stuck in his cell, which provides only a few feet of open space.

16. Likewise, Mr. Jones' desire and efforts to exercise have been thwarted by Defendants' policies and practices. Defendants held Mr. Jones in N2 for 356 consecutive days,

during which they denied him any yard access. Mr. Jones lost a significant amount of weight due to muscle atrophy and depression, and he developed chronic back and neck pain from immobility in his cramped cell.

17. Defendants have similarly deprived Mr. Castillo of his right to exercise, despite his desire to do so. During the more than two years Mr. Castillo was confined in the N2 segregation unit,[1] Defendants deprived him of the ability to exercise for extended periods—up to eight months at a time. As a direct result of this deprivation, Mr. Castillo experienced significant weight loss due to muscle atrophy, his chronic arthritis worsened, and he suffered panic attacks and severe depression.

18. The Defendants' denial of exercise from the Plaintiffs was not due to any imminent concern for the safety or security of others. There was no justification for the long-term denial of exercise, movement, and out-of-cell time each of the Plaintiffs endured.

19. Defendants are seasoned corrections professionals who are aware of the substantial risks to Plaintiffs' health and well-being stemming from their policies and practices of denying exercise and out-of-cell time. Defendants have been on notice for years—including from IDOC's own policy requirements, other solitary confinement litigation, expert testimony, official reports and audits of IDOC's confinement practices generally and of Menard's practices in particular, and prisoner grievances—that being locked in a small cell for weeks or months at a time results in serious physical and mental harm. Yet they have acted, and continue to act, with deliberate and

[1] Mr. Castillo has been housed in both the segregation and administrative detention units located in North 2. References to "the segregation unit" or "N2 segregation" in this complaint are for the purpose of clarifying Mr. Castillo's specific placement in North 2. Mr. Johnson and Mr. Jones were also housed in the N2 segregation unit.

reckless indifference by refusing Plaintiffs essential opportunities for physical activity and access to the outdoors.

20. Plaintiffs bring this action seeking declaratory relief and compensation to remedy the Defendants' gross violations of their Eighth Amendment rights and to deter Defendants from committing such misconduct in the future. Mr. Johnson also seeks injunctive relief to ensure that, going forward, he is afforded the minimal civilized measure of life's necessities, including his fundamental right to exercise.

## THE PARTIES

### Plaintiffs

21. Mr. Johnson, Mr. Jones, and Mr. Castillo are individuals who are currently incarcerated at Menard, a maximum-security prison under the control of IDOC. They bring suit individually and jointly against the Defendants in this matter. All three seek declaratory relief and compensatory and punitive damages for the harm they have suffered in the past. Mr. Johnson also seeks prospective injunctive relief as to the Defendants' unconstitutional policies and practices.

22. Mr. Johnson is a 49-year-old man currently incarcerated at Menard, where he has spent substantial time in extreme isolation without the ability to exercise. Since his transfer to Menard in December 2023, Mr. Johnson has been repeatedly housed in North 2 as a result of Defendants' use of "stacking"—holding him in segregation for long periods of time by imposing consecutive sanctions and stints on investigative status. While in N2, Mr. Johnson was never offered yard and was deprived of the ability to exercise. As a result, over the more than 30 months he has been at Menard, he has spent just an estimated 40 hours out of his cell, all of which occurred while he was in general population in East House. Given Defendants' ongoing policies and practices at issue here, including their misuse of investigatory status to repeatedly confine Mr.

Johnson in restrictive housing (described below), Mr. Johnson's imminent return to these conditions is highly likely.

23. Mr. Jones is a 34-year-old man currently incarcerated at Menard, where he has spent substantial time in extreme isolation without the ability to exercise. Mr. Jones was held in solitary confinement in North 2 for extended durations of time, including 356 consecutive days from November 7, 2024 until October 28, 2025. During that period, he was entirely denied yard access and only allowed out of his cell on rare occasions.

24. Mr. Castillo is a 42-year-old man currently incarcerated at Menard, where he has spent substantial time in extreme isolation without the ability to exercise. Mr. Castillo spent over two years in the North 2 segregation unit, from on or about April 21, 2023 to June 27, 2025, due to Defendants' use of stacking. During his time in North 2 segregation, Mr. Castillo was denied access to yard for months at a time.

**Defendants**

25. Defendant Latoya Hughes has been the Director of IDOC since April 2023. Defendant Hughes has final policy-making authority within IDOC and is personally involved in authorizing and maintaining the unconstitutional policies and practices challenged by Plaintiffs in this suit. Defendant Hughes reviews grievances that are appealed to the Administrative Review Board ("ARB") and renders the final decision of the ARB, including grievances involving access to out-of-cell time. Defendant Hughes has personally reviewed such grievances submitted by each of the Plaintiffs. Defendant Hughes, or the IDOC Deputy Director in her stead, also reviews the placement of prisoners in indeterminate or long term[2] disciplinary segregation within six months

[2] Per 20 Ill. Admin. Code § 504.115(a), long term segregation placement refers to "offenders who have disciplinary segregation terms greater than one year."

of their placement in segregated housing and at least once every 90 days thereafter. This review is to include a face-to-face interview with the prisoners. The Director has the authority to establish a segregation release date through this review. Defendant Hughes had authority to conduct this review for Plaintiff Castillo, who was sentenced to more than one year of segregation while at Menard. Defendant Hughes also had the authority to ensure all Plaintiffs received constitutionally adequate opportunities for exercise. Prior to serving as Director, Defendant Hughes served as Chief of Staff and Chief Inspector for IDOC. Defendant Hughes is sued in her official capacity for injunctive and declaratory relief on behalf of Plaintiff Johnson, and in her individual capacity for declaratory relief and monetary damages on behalf of all Plaintiffs.

26. Defendant Brittany Greene is the current Deputy Director of Region 2 at IDOC, as of December 2025. In this role, Defendant Greene oversees the operations of Menard and other adult correctional centers in the region. Defendant Green is personally involved in maintaining the unconstitutional policies and practices challenged by Plaintiffs in this suit. As Deputy Director, Defendant Greene, with Defendant Hughes, is responsible for reviewing the placement of prisoners in indeterminate or long-term disciplinary segregation within six months of their placement in segregated housing and at least once every 90 days thereafter. This review is to include a face-to-face interview with the prisoners. Plaintiff Alex Castillo was subject to such a review. The Deputy Director has the authority to establish a segregation release date through this review. Defendant Greene also had the authority to approve any deviations to programming and movement restrictions during administrative lockdowns at Menard. She had the authority to ensure Plaintiffs received constitutionally adequate exercise. Defendant Greene has been employed by IDOC since 2011 and has served as an Assistant Warden of Programs and as Warden.

Defendant Greene is sued in her individual capacity for declaratory and monetary relief on behalf of all Plaintiffs.

27. Defendant Angela Locke is the current Chief of Operations for IDOC. Prior to this appointment, from April 2022 to December 2025, Defendant Locke served as the Deputy Director of Region 2 at IDOC. As Deputy Director of Region 2, Defendant Locke oversaw the operations of adult correctional centers in the region, including Menard. Defendant Locke was personally involved in maintaining the unconstitutional policies and practices challenged by Plaintiffs in this suit. As Deputy Director, Defendant Locke, with Defendant Hughes, was charged with reviewing the placement of prisoners in indeterminate or long-term disciplinary segregation within six months of their placement in segregated housing and at least once every 90 days thereafter. This review is to include a face-to-face interview with the prisoners. Mr. Castillo was subject to such a review. The Deputy Director has the authority to establish a segregation release date through this review. And Defendant Locke had the authority to ensure Plaintiffs received constitutionally adequate opportunities for exercise. As Deputy Director of Region 2, Defendant Locke also had the authority to approve any deviations to programming and movement restrictions during administrative lockdowns. In her current role as Chief of Operations, Defendant Locke must approve all non-emergency, administrative lockdowns. She has the authority to prohibit the other Defendants, including Defendant Plummer, from implementing non-essential administrative lockdowns, and to ensure Defendants are not permitted to use administrative lockdowns as a pretext to unlawfully deny people, including Plaintiffs, yard time. Defendant Locke has been an employee of IDOC since 1999, and has served as a Correctional Officer, Lieutenant, Shift Supervisor, and Warden. Defendant Locke is sued in her individual capacity for declaratory relief and monetary damages on behalf of all Plaintiffs.

28. Defendant Matthew Plummer has been the Day-to-Day Warden at Menard since December 26, 2025. In this role, Plummer is responsible for daily operations of Menard. Defendant Plummer authorizes and maintains the unconstitutional policies and practices at Menard that are challenged by Plaintiffs in this suit. Defendant Plummer is personally involved in and responsible for making disciplinary decisions, initiating and overseeing lockdowns, and authorizing prisoner movement. He reviews and approves all Adjustment Committee[3] disciplinary sanctions, including Plaintiffs' placements in N2. Defendant Plummer has the authority to release individuals from temporary confinement and makes the final decision as to whether individuals can continue on "investigative status." As the Chief Administrator, Defendant Plummer oversees and is responsible for the conditions of confinement in N2, including prisoners' access to out-of-cell time and recreation. In the absence of the Assistant Wardens, Defendant Plummer chairs the Restrictive Housing Review Committee ("RHRC") and in that role is personally responsible for reviewing each individual's placement in Extended Restrictive Housing ("ERH").[4] The RHRC reviews the status of each individual's placement in ERH every seven days for the first 60 days of their placement and at least every 30 days thereafter. The RHRC develops Transition and Stabilization Plans ("TSP") for individuals to transition from ERH to less restrictive alternatives. Plaintiff Johnson was subject to such a review while Plummer was the Day-to-Day Warden. Upon information and belief, when acting as Chair of the RHRC, Defendant Plummer had the authority

[3] The Adjustment Committee is the facility-level disciplinary hearing body for major offenses. *See* 20 Ill. Admin. Code § 504.50. It is appointed by the Chief Administrative Officer, and is composed of at least two IDOC staff, including a chairperson. 20 Ill. Admin. Code § 504.70. The Adjustment Committee is charged with convening hearings, evaluating evidence, determining whether the offense occurred, and recommending any disciplinary action. 20 Ill. Admin. Code § 504.80.

[4] IDOC Administrative Directive 05.15.100(II)(E) defines ERH as "a form of restrictive housing that separates an individual in custody from general population and restricts the individual in custody to their cell for 22 hours or more per day for 29 days or more, but less than 1 (one) year for the safe and secure operation of a facility."

to shorten the time Plaintiff Johnson spent in ERH. Defendant Plummer reviews all emergency grievances and makes the final decision on all grievances at Menard, including grievances about out-of-cell time and lack of yard in restrictive housing. Additionally, Defendant Plummer initiates administrative lockdowns and, in consultation with the Deputy Director, approves programming and out-of-cell time restrictions during such lockdowns. Defendant Plummer had the authority to release Mr. Johnson from N2 and otherwise ensure he received constitutionally adequate opportunities for exercise. Defendant Plummer has been employed by IDOC for years and has served as a Correctional Officer, Shift Supervisor, Assistant Warden of Programs, and Warden. Defendant Plummer is sued in his official capacity for declaratory and injunctive relief on behalf of Plaintiff Johnson, and in his individual capacity for declaratory relief and monetary damages on behalf of all Plaintiffs.

29. Defendant Anthony Wills was the Warden of Menard from April 2021 to December 2025. As Warden, he authorized and maintained the unconstitutional policies and practices at Menard that are challenged by Plaintiffs in the instant suit. Defendant Wills was personally involved in and responsible for making disciplinary decisions, initiating lockdowns, and authorizing prisoner movement. He had the authority to review and approve all Adjustment Committee disciplinary sanctions and placements in N2, including for Plaintiffs. Defendant Wills had the authority to release prisoners from temporary confinement and was responsible for making final decisions as to whether an individual, including Plaintiff Johnson, would stay on "investigative status." As the Chief Administrator at Menard, Defendant Wills oversaw and was responsible for the conditions of confinement in N2, including access to out-of-cell time and recreation. In the absence of the Assistant Wardens, Defendant Wills chaired Menard's RHRC and in that role was personally responsible for reviewing each individual's placement in ERH. All

Plaintiffs were subject to such a review while Defendant Wills was Warden. Upon information and belief, Wills had the authority to shorten the time Plaintiffs spent in ERH. Defendant Wills reviewed all emergency grievances and made the final decision on all grievances at Menard, including grievances about out-of-cell time in restrictive housing. Additionally, Defendant Wills initiated administrative lockdowns and, in consultation with the Deputy Director, approved programming and out-of-cell restrictions during lockdowns. Defendant Wills had the authority to release the Plaintiffs from N2 and otherwise ensure they received constitutionally adequate opportunities for exercise. Defendant Wills has been employed by IDOC since 1996 and served as a Correctional Officer, Sergeant, Shift Supervisor, Assistant Warden of Programs, and Warden. Defendant Wills is sued in his individual capacity for declaratory relief and monetary damages on behalf of all Plaintiffs.

30. Defendant Mac-Shane Frank is the Assistant Warden of Operations at Menard as of January 1, 2026. In that role, Defendant Frank is personally involved in maintaining the unconstitutional policies and practices at Menard that are challenged by Plaintiffs in this suit. The RHRC must be chaired by either the Assistant Warden of Operations or the Assistant Warden of Programs. As the Assistant Warden of Operations, Defendant Frank has served as Chair of the RHRC since February 10, 2026. He is personally responsible for reviewing placements in ERH. Mr. Johnson was subject to this review while Defendant Frank was Chair of the RHRC. Upon information and belief, Defendant Frank had the authority to shorten Mr. Johnson's time in ERH. In the Warden's absence, Defendant Frank has the authority to review and approve restrictive housing placements and can assume day-to-day responsibility for the operation of the facility, including but not limited to reviewing grievances, managing lockdowns and prisoner movement, and reviewing other disciplinary matters. Defendant Frank had the authority to ensure that

Plaintiffs received constitutionally adequate opportunities for exercise. Defendant Frank has been employed by IDOC for over 20 years and has served as a Correctional Officer, Correctional Lieutenant, and Assistant Warden. Defendant Frank is sued in his individual capacity for declaratory relief and monetary damages on behalf of all Plaintiffs.

31. Defendant Kevin Reichert was the Assistant Warden of Operations at Menard from May 1, 2021 until July 2025. In that role, Defendant Reichert was personally involved in maintaining the unconstitutional policies and practices at Menard that are challenged by Plaintiffs in this suit. Defendant Reichert served as Chair of the RHRC from December 13, 2023 until April 1, 2025. He was personally responsible for reviewing placements in ERH. All Plaintiffs had their placements reviewed while Defendant Reichert was Assistant Warden of Operations, and upon information and belief, he had the authority to shorten the Plaintiffs' time in ERH. In the Warden's absence, Defendant Reichert reviewed and approved restrictive housing placements and could assume day-to-day responsibility for the operation of the facility, including but not limited to reviewing grievances, managing lockdowns and prisoner movement, and reviewing other disciplinary matters. On information and belief, Defendant Reichert had the authority to release the Plaintiffs from N2 and otherwise ensure they received constitutionally adequate opportunities for exercise. Defendant Reichert has been employed by IDOC since 1995, and has served as a Correctional Officer, Correctional Lieutenant, Security Investigator, and Assistant Warden. Defendant Reichert is sued in his individual capacity for monetary damages on behalf of all Plaintiffs.

32. Defendant Tonya Knust was the Assistant Warden of Programs at Menard from November 15, 2023 until January 2026. In that role, Defendant Knust was personally involved in maintaining the unconstitutional policies and practices at Menard that are challenged by Plaintiffs

in this suit. As the Assistant Warden of Programs, Defendant Knust served as co-chair of the RHRC from August 15, 2025 until February 10, 2026. She was personally responsible for reviewing placements in ERH. All Plaintiffs had their placements reviewed while Defendant Knust was Assistant Warden of Operations, and upon information and belief, she had the authority to shorten the Plaintiffs' time in ERH. In the Warden's absence, Defendant Knust had the authority to review and approve restrictive housing placements and could assume day-to-day responsibility for the operation of the facility, including but not limited to reviewing grievances, managing lockdowns and movement, and reviewing other disciplinary matters. Defendant Knust had the authority to ensure that Plaintiffs received constitutionally adequate opportunities for exercise. Defendant Knust has been employed by IDOC since 1997 and has served as a Correctional Officer, Grievance Counselor, Prison Law Librarian, and Assistant Warden. Defendant Knust is sued in her individual capacity for declaratory relief and monetary damages on behalf of all Plaintiffs.

## JURISDICTION AND VENUE

33. The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs bring suit for injunctive and declaratory relief as well as for monetary damages under the Eighth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 for violations of their civil rights. Plaintiffs seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

34. Venue is proper in the United States District Court for the Southern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the Plaintiffs reside at Menard, which is located in the district, and a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs have occurred in this district. Additionally, venue is proper under 28 U.S.C. § 1391(b)(1) as one or more of the Defendants resides in the district.

## FACTUAL ALLEGATIONS

**A. Exercise is a Fundamental and Constitutionally Protected Right and its Deprivation Causes Severe Physical and Psychological Harm.**

35. The ability to exercise is a fundamental human right. The United States Supreme Court has recognized for decades that exercise is a basic human need, much like food and warmth. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

36. The American Academy of Psychiatry and the Law also recognizes that exercise and outdoor access for incarcerated people is a basic human right and a strong indicator of mental and physical health outcomes.

37. The American Correctional Association (ACA) Performance-Based Standards for Adult Correctional Institutions require that every prisoner be offered access to an exercise area for at least one hour per day, seven days a week. The ACA mandates that prisoners held in any form of restrictive housing receive a minimum of one hour of out-of-cell recreation five days per week.

38. The American Bar Association's *ABA Criminal Justice Standards on Treatment of Prisoners* recognizes that correctional facilities "should provide all prisoners daily opportunities for significant out-of-cell time and for recreation at appropriate hours that allows them to maintain physical health[.]" The standards further provide that each prisoner be entitled to at least one hour per day of open-air exercise.

39. International legal standards similarly recognize that incarcerated individuals have the right to this basic necessity. The United Nations Standard Minimum Rules for the Treatment of Prisoners require that every prisoner not employed in outdoor work receive at least one hour of exercise in the open air daily.

40. The World Health Organization (WHO) Guidelines on Physical Activity and Sedentary Behavior recommend that all adults undertake regular activity, including at least 150 to

300 minutes of moderate intensity activity or the equivalent each week. The WHO also recommends that adults do muscle-strengthening activity at moderate or greater intensity involving all major muscle groups on two or more days a week.

41. The right to out-of-cell time is also established under Illinois law, which requires that Defendants "shall provide facilities for every committed person to leave his cell for at least one hour each day unless the chief administrative officer determines that it would be harmful or dangerous to the security or safety of the institution or facility." 730 Ill. Comp. Stat. 5/3-7-2(c).

42. The Illinois Administrative Code mandates that individuals in segregation "shall be afforded the opportunity to recreate outside their cells a minimum of eight hours per week distributed in increments over no less than two days per week[.]" 20 Ill. Admin. Code § 504.670(a).

43. IDOC's own policies require that "[a] minimum of ten hours of recreation per week, inclusive of no fewer than one hour of exercise outside of the cell five days per week, shall be provided to every individual in custody who has been placed in [Restrictive Housing]." IDOC Admin. Directive 05.15.100(II)(J)(2). For individuals in ERH, as all Plaintiffs were, the requirement expands to a minimum of ten hours of unstructured out-of-cell time (such as yard, barber, showers, etc.) and a minimum of ten hours of structured out-of-cell time (such as chaplaincy, law library, mental health services, health care education services, and other programming) every week. The unstructured time "shall include no fewer than one hour of exercise outside of the cell five days per week." *Id.* at 05.15.100(II)(J)(3)(a).

44. IDOC policy also mandates that people in restrictive housing be provided "[o]ut of cell opportunities for recreation, religion, education, continuation of mental health treatment plan, skill-building and pro-social activity with other individual[s] in custody . . . on a weekly basis."

*Id.* 05.15.100(II)(H)(11). Those in ERH "shall have access to programs and services including, but not limited to, education, commissary, library, social, and counseling services, religious guidance, and recreational programs." *Id.* 05.15.100(II)(J)(1)(s).

45. Yet, despite these well-established rights and policies, Plaintiffs have been systematically denied access to exercise by the Defendants as set forth in this Complaint. They were denied yard time, one of the only out-of-cell opportunities for individuals like Plaintiffs housed in segregation units at Menard. They also lacked access to dayroom, gym, or other out-of-cell activities. As a result, Plaintiffs went months on end without the ability to exercise or adequately move their bodies.

46. There is scientific consensus about the destructive consequences of such prolonged exercise deprivation and immobility. Movement and exercise are essential to maintaining normal functioning. Denying prisoners access to necessary human activity places them at serious risk of physical, emotional, and psychological harm.

47. People, like Plaintiffs, deprived of indoor and outdoor exercise in prison, are severely restricted in movement. They spend most of their time in bed or otherwise immobile in their cramped cells. Immobility leads to degradation of cardiovascular, respiratory, gastrointestinal, and musculoskeletal functioning. Other negative physiological effects include rapid reduction in muscle mass and bone mineral density.

48. Additional physical consequences of immobility include an increased risk of thromboembolic events, pressure ulcers, insulin resistance, and development of delirium or cognitive processing impairments and alterations in sleep patterns. Many of the negative effects begin within days of confinement, but their consequences can last much longer. They grow more severe the longer the deprivation persists.

49. Human beings also need movement and exercise to maintain healthy mental functioning. The mental toll from being confined in a cell for days without movement can be just as damaging as the physical toll.

50. Physical and social isolation, coupled with sensory deprivation and forced idleness, creates a toxic combination associated with a multitude of psychological harms, including anxiety, hypersensitivity, anger, obsessive thoughts, depression, cognitive disturbances, insomnia, post-traumatic stress disorder (PTSD), impulse control issues, loss of identity, paranoia, and psychosis. The deprivation of yard time and other out-of-cell activity also takes away an important stress management outlet that is essential for people, like Plaintiffs, living in a traumatic, isolated, and punitive environment.

## B. By Their Policies and Practices Restricting Yard and Out-of-Cell Time in North 2, Defendants Unlawfully Deprived Plaintiffs of Essential Exercise and Movement.

### 1. *Defendants Deprive People in N2, including Plaintiffs, of Exercise While Also Imposing Stacked or Prolonged Segregation Terms, Recklessly Disregarding the Known Harmful Impact of Prolonged Exercise Deprivation.*

51. People are generally housed in the N2 segregation unit as a result of a disciplinary hearing ("disciplinary status"), pending a disciplinary hearing or investigation ("temporary confinement"), or when suspected of a potential disciplinary infraction ("investigative status").

52. Defendants intentionally maintain policies and practices that have unlawfully deprived people in North 2, including the Plaintiffs, of their fundamental right to exercise. These policies and practices include the intentional deprivation of yard, the denial of other out-of-cell activities, and the use of stacked discipline.

53. Menard opened in 1878 and is one of the oldest prisons in Illinois. The restrictive housing unit, North 2, is located in North House. Plaintiffs were each housed in North 2 during the operative period of this Complaint.

54. During their confinement in the North 2 segregation unit, Defendants denied Plaintiffs nearly all opportunities to move their bodies, both inside or outdoors.

55. Although none of the Plaintiffs had formal yard restrictions imposed as a disciplinary sanction, Defendants subjected each of them to *de facto* yard restrictions by virtue of their placement in N2 segregation. Plaintiffs did not receive anywhere near the legally mandated amount of time outdoors; they often received no outdoor time at all for weeks or months at a time.

56. The lack of yard was not offset by opportunities for indoor movement because of the severe restrictions Defendants imposed on any out-of-cell time for Plaintiffs.

57. Menard offers the fewest out-of-cell activities for people in restrictive housing of any prison in the IDOC system: just yard and mental health programming. And people in N2 segregation rarely receive even those.

58. Plaintiffs did not have access to an indoor exercise space, gym, or dayroom. They were not offered opportunities for education or work and were rarely offered group therapy despite having mental health conditions. They had no access to contact visitation, congregate meals, barber shop, or religious services. They had no access to a physical law library. Commissary was regularly cancelled or brought to Plaintiffs at their cells.

59. Plaintiffs did not receive the number of showers required under IDOC policy for extended periods of time. The limits on showering took away one of Plaintiffs' only opportunities for out-of-cell movement and compounded the harms caused by the Defendants' denial of exercise.

60. On the rare occasions when Plaintiffs were allowed out of their cells indoors, they were forced to wear handcuffs that restricted their ability to freely move their bodies. Plaintiffs were shackled every time they had a phone call or legal visit.

61. As a result of being deprived of yard for long periods of time, Plaintiffs suffered serious physical and mental harm, as set forth below.

62. The impact of Defendants' yard denial practices was exacerbated by their policies and practices of "stacking"—imposing consecutive disciplinary penalties or periods on investigative status upon prisoners in Menard, including Plaintiffs.

63. Defendants do not place any time limit on how long an individual with stacked disciplinary tickets or investigative stints may remain in segregation. Prisoners in the N2 segregation unit can be in disciplinary segregation or on investigative status for months or years at a time. As a result, stacked discipline functionally becomes a long-term ban on exercise and out-of-cell time.

64. Defendants Plummer and Wills ("Warden Defendants") were responsible for Plaintiffs suffering deprivations of exercise and movement in a variety of ways.

65. The Warden Defendants are responsible for approving and reviewing Adjustment Committee decisions placing individuals in restrictive housing.

66. They are similarly responsible for decisions to place someone on investigative status. Under IDOC policy, the Warden Defendants can place an individual on investigative status in restrictive housing in North 2 for up to 60 days while an investigation proceeds. Prisoners can be placed repeatedly on such investigative status without being found guilty of any offense.

67. The Warden Defendants are also responsible for reviewing any recommendations by the Adjustment Committee to approve or deny prisoner petitions to reduce their time in segregation.

68. When approving Plaintiffs' stacked and prolonged disciplinary segregation terms and investigative stints, the Warden Defendants were aware that Menard was failing to provide the mandated amount of out-of-cell time to Plaintiffs. They knew that Plaintiffs' placements in North 2 segregation would also result in significant deprivations of yard and movement. And they knew of the harms caused by such deprivations. Nonetheless, the Warden Defendants approved the segregation terms, recklessly disregarding the substantial and known risk to Plaintiffs' health and well-being caused by long-term deprivation of exercise and other bodily movement.

69. Defendants Reichert, Frank, and Knust are similarly responsible for the deprivations of Plaintiffs' fundamental rights.

70. Defendants Reichert, Frank, and Knust all served as chairs of the RHRC. In that role, they reviewed Plaintiffs' continued placements on ERH. They knew that placement in North 2 segregation was a *de facto* sentence of yard deprivation. They also knew of the serious harms caused by solitary confinement, including those caused by exercise deprivation. Yet they recklessly disregarded the risk to Plaintiffs' physical and mental well-being by approving their continued placements in ERH.

71. Defendants imposed these heinous deprivations of the fundamental right to exercise upon the Plaintiffs without any security or safety justification.

72. None of the Plaintiffs were disciplined for an infraction relating to yard or recreation. None of the Plaintiffs had a yard prohibition.

73. As demonstrated by extensive empirical evidence, subjecting people to solitary confinement and lockdowns does not make prisons safer or deter people from committing violations of prison rules. Greater out-of-cell time improves safety, rehabilitation, and behavioral outcomes for all prisoners.

**Omar Johnson**

74. Mr. Johnson entered IDOC custody on June 18, 1999, and has been incarcerated at Menard since December 28, 2023. Over the course of his time at Menard, Mr. Johnson has spent 375 days in segregation in North 2. Mr. Johnson received no yard time while in segregation and was deprived of the right to exercise without exception. He was constantly confined to the narrow quarters of his cell. The attendant immobility he suffered resulted in serious physical and psychological harm.

75. Mr. Johnson was placed in North 2 segregation upon his arrival at Menard in December 2023 until February 2024, during which time he was not offered a single opportunity for outdoor exercise.

76. On or about February 21, 2024, Mr. Johnson was transferred from North 2 to East House. People in East House suffer many of the same deprivations as those in N2, including frequent yard cancellation and constant administrative lockdowns. Despite being designated as general population status in East House, Mr. Johnson only left his cell a handful of times and went out to yard once during his three months there.

77. On or about May 22, 2024, Mr. Johnson was placed back in North 2, where he remained for approximately two months. Mr. Johnson was denied yard access and showers in North 2 for the entirety of that period.

78. From July 2024 until November 2024, Mr. Johnson was back in East House. During those four months, he was taken to yard just a couple of times.

79. On or about November 21, 2024, Mr. Johnson was placed in North 2 on investigative status. He remained in segregation until early December 2024. He received no access to yard during that period.

80. On or about December 5, 2024, Mr. Johnson returned to East House, where he remained until late March. During this time, he received outdoor recreation twice and only left his cell a handful of other times.

81. On or about March 27, 2025, Mr. Johnson was again placed in North 2 on investigative status. He remained in segregation for 17 days, during which he was not given any out-of-cell time.

82. Mr. Johnson returned to East House around mid-April 2025 and remained there until late July 2025. During this time, he went to yard twice and made one law library visit and one commissary visit.

83. On or about July 28, 2025, Mr. Johnson was transferred back to North 2, where he stayed for 16 days, confined to his cell without exception.

84. Defendant Wills was the Warden each time Mr. Johnson was placed in North 2 from Mr. Johnson's initial transfer to Menard until the end of 2025. Defendant Wills was responsible for authorizing Mr. Johnson's placements in investigative status and continued placement in restrictive housing. He was ultimately responsible for restricting Mr. Johnson's access to out-of-cell time and exercise during that period.

85. Mr. Johnson returned to East House on or about August 13, 2025, where he stayed until the end of October 2025. He went to yard once and made one law library visit and one commissary visit during this time.

86. From around October 31 to November 6, 2025, Mr. Johnson was placed on crisis watch in N2, where he was confined in a sealed cell on Gallery 5 without any natural light, ventilation, or access to yard or any out-of-cell activity. He received no exercise during this period.

87. After his release from crisis watch, Mr. Johnson went back to East House for about a month, where he was again denied recreation.

88. On or about December 2, 2025, Mr. Johnson was placed back in North 2. The Adjustment Committee held two disciplinary hearings for Mr. Johnson based on two separate incidents. In accordance with the Defendants' stacking policies and practices, Defendants handed down six different segregation sentences to be served consecutively. As a result, Mr. Johnson was to receive 243 total days of segregation. Mr. Johnson spent over 90 days in segregation before his sentence was formally approved by Defendant Plummer.

89. Defendant Plummer's ratification of the Adjustment Committee decisions impermissibly punished Mr. Johnson for the same offense multiple times and resulted in him being sentenced to over seven months of solitary confinement based off two alleged disciplinary incidents.

90. Defendant Plummer ratified this decision despite knowing that Mr. Johnson already had been deprived of over 90 days of exercise and would be grossly deprived of additional exercise and movement. Defendant Pummer recklessly disregarded the impact of the stacked sentences on Mr. Johnson's health and well-being.

91. Defendants Reichert, Knust and Frank all served as chairs of the RHRC during Mr. Johnson's time in North 2. They had the authority to review the status of his placement in ERH and develop a plan to transition Mr. Johnson from ERH to a less restrictive alternative as soon as possible.

92. On information and belief, these Defendants did not adjust his placement or implement a plan to transition him out of the solitary conditions on ERH in N2, even though they knew that Mr. Johnson had been subject to multiple stacked sentences in N2 that deprived him of exercise and movement and any outdoor time for months. In permitting his continued placement in N2, Defendants Reichert, Knust, and Frank recklessly disregarded the substantial risk of harm to Mr. Johnson's physical and mental well-being.

93. After reentering North 2 in December 2025, Mr. Johnson was again denied the light of day. Mr. Johnson never received yard time during any of his time in North 2 and was deprived of every alternative exercise option as well. He had no access to indoor exercise facilities and no ability to move his body in his tiny cell.

94. Mr. Johnson also went months in N2 without a shower. For over one hundred consecutive days starting in December 2025, Mr. Johnson was not allowed a single shower, purportedly on the grounds that he could not produce a regulation t-shirt—a t-shirt that Defendants prevented him from purchasing by denying him commissary access.

95. Mr. Johnson filed his original complaint in this matter in March 2026 while he was in segregation in North 2.

96. Mr. Johnson was removed from North 2 for one day on June 16, 2026, after serving 196 days of the segregation sentence imposed on him in December 2025. He was placed in a cell in East House for one night before being transferred back to North 2 in June 2026 into abhorrent conditions.

97. Upon his return to North 2 on June 17, 2026, Mr. Johnson was confined in a cell that was filthy, hot, humid, and poorly ventilated. Mr. Johnson has asthma and was unable to breathe well in such conditions. His body was under severe stress. A correctional officer relocated

Mr. Johnson to another North 2 cell on June 18, 2026. This stint in N2 was under the pretext of investigative status; he was never charged with a disciplinary offense. Defendant Plummer was authorized to approve this placement.

98. Mr. Johnson grieved the denial of out-of-cell time and yard access, but his grievances were denied and the yard deprivation continued. In denying one of his grievances, the counselor stated that "yard is ran as time and staffing allows." The grievance officer also responded that "Menard C.C. is placed on a level 2 lockdown, daily, per the Warden as directed by the Deputy Director as a result of a staff shortage being experienced at the facility." Defendant Wills was Warden at the time and Defendant Locke was the Deputy Director.

99. Mr. Johnson filed grievances about out-of-cell time that were personally reviewed and then denied by Defendants Reichert and Wills. The denial of the grievances was ultimately approved by Defendant Hughes.

100. Mr. Johnson spent much of his time in North 2 on "C grade," , which further restricted his out-of-cell time, compounding the harm of exercise deprivation. Prisoners on C grade are not eligible for institutional privileges, except for yard, restricted commissary, and visitation, which Mr. Johnson was not receiving anyway.

101. On July 1, Mr. Johnson was moved from North 2 to East House

102. As a result of Defendant Hughes and the Warden Defendants' policies and practices, including their repeated use of stacking and unrestricted investigative status on Mr. Johnson, Mr. Johnson is at high risk of being placed back in North 2 again in the near future.

**<u>Clarence Jones</u>**

103. Since Mr. Jones' arrival at Menard, he has spent over a year in solitary confinement in North 2. Defendants deprived Mr. Jones of his right to exercise for 356 consecutive days,

denying him any yard time and providing very few opportunities to leave his cell. Consequently, Mr. Jones suffered serious psychological and physical harm.

104. Mr. Jones entered the IDOC system on June 15, 2023. IDOC moved him to Menard in a segregation-to-segregation transfer on February 21, 2024, at which time he spent about 60 days in North 2. In April 2024, IDOC released Mr. Jones to West House, a general population unit at Menard.

105. On or about November 7, 2024, Mr. Jones was given a disciplinary ticket for having a tattoo needle in his cell. The Adjustment Committee found Mr. Jones guilty and sentenced him to a full year of segregation. Mr. Jones continued to be held in segregation for 102 days before Defendant Wills, as the Chief Administrative Officer, reviewed and approved Mr. Jones' one-year sentence on February 17, 2025. Mr. Jones had no history of violence at Menard and had received no other disciplinary reports during his approximately seven months in West House.

106. Defendant Wills affirmed Mr. Jones' segregation sentence despite knowing that Mr. Jones already had been deprived of over 100 days of exercise, and that continued placement in North 2 would result in further exercise and movement deprivation. Nonetheless, Defendant Wills recklessly disregarded the impact of the prolonged sentence and the attendant risks it would have on Mr. Jones' health and well-being.

107. Defendants Reichert and Knust both served as chairs of the RHRC during Mr. Jones' time in North 2. They had the authority to review the status of his placement in ERH and develop a plan to transition Mr. Jones from ERH to a less restrictive alternative as soon as possible.

108. On information and belief, these Defendants did not adjust Mr. Jones' placement or implement a plan to transition him out of the solitary conditions on ERH in N2, even though they knew that Mr. Jones had been deprived of exercise, movement, and any outdoor time for

months. In permitting his continued placement in N2, Defendant Reichert and Knust recklessly disregarded the substantial risk of harm to Mr. Jones' physical and mental well-being.

109. Mr. Jones remained in solitary confinement in North 2 for 356 consecutive days, during which he received no yard and almost no out-of-cell time.

110. For this nearly one-year period, Mr. Jones only left his cell for a handful of hours, for a few showers, video visits with his family, and legal calls.

111. Mr. Jones repeatedly grieved the denial of outdoor exercise and out-of-cell time, including when Defendant Wills was Warden. Mr. Jones' grievances were denied and the yard deprivation continued. In denying one of those grievances, the counselor stated that "movement is an administrative decision" and cited the IDOC directive permitting exercise deprivation during lockdowns.

112. Mr. Jones filed grievances about out-of-cell time that were personally reviewed and then denied by Defendants Plummer and Reichert; the denial of the grievances was ultimately approved by Defendant Hughes.

113. Even on the rare occasions when yard was run for others in his gallery, Mr. Jones was denied recreation for pretextual reasons untethered to any legitimate security justification.

114. Mr. Jones spent much of his time in North 2 on "C grade," which further restricted his out-of-cell time, compounding the harm of Defendants' exercise deprivation.

**Alex Castillo**

115. Mr. Castillo spent 799 days, or 26 months, in the North 2 segregation unit, from April 2023 until June 2025.

116. On April 21, 2023, Mr. Castillo was transferred to Menard in a segregation-to-segregation transfer. He was held in segregation at Menard under investigative status until approximately May 19, 2023.

117. On May 19, 2023, IDOC imposed disciplinary tickets on Mr. Castillo that resulted in a six-month segregation sentence handed down by the Adjustment Committee. On September 3, 2023, IDOC imposed additional disciplinary tickets on Mr. Castillo that resulted in an additional three-month segregation sentence. On October 11 and October 28, 2023, IDOC imposed more disciplinary tickets on Mr. Castillo that resulted in segregation sentences of one year and six months, respectively. On March 31, 2025, IDOC again imposed disciplinary tickets on Mr. Castillo, resulting in an additional six-month sentence.

118. During his time in N2 segregation, Defendants rarely provided Mr. Castillo with yard time. He was given yard access an estimated 20 times total over more than two years.

119. These rare opportunities to see sunlight were sporadic and separated by long periods of deprivation. Defendants once deprived Mr. Castillo of all yard time for approximately eight consecutive months. Defendants' decision to deprive Mr. Castillo of his right to exercise severely harmed his physical and mental health.

120. The risks to Mr. Castillo's health were compounded by deprivation of other movement. Mr. Castillo would sometimes go weeks without access to a shower.

121. Mr. Castillo was released into East House on or about June 27, 2025. On or about July 1, 2025, Mr. Castillo was transferred to administrative detention, where he remains as of July 2026.

122. Taken together, as a result of stacking, Mr. Castillo was sentenced to over two years of N2 segregation. Each time Mr. Castillo neared his release date, new disciplinary tickets were imposed, effectively extending his segregation and depriving him of exercise indefinitely.

123. Defendant Wills, as the Warden, had the authority to approve Mr. Castillo's initial and continued placement in segregation. He similarly had the authority to remove him from N2 segregation.

124. Defendants Reichert and Knust served as chairs of the RHRC while Mr. Castillo was in N2 segregation. They had the authority to review his placement and develop a plan to facilitate his transition to a less restrictive housing unit.

125. Because Mr. Castillo was placed in N2 segregation for longer than one year, Defendants Hughes, or alternatively Defendant Locke, was required to personally review Mr. Castillo's segregation placement, including a face-to-face interview once every 90 days.

126. Defendants Hughes and Locke had the authority to establish a specific segregation release date for Mr. Castillo but failed to do so.

127. All of these Defendants knew of the serious risk to Mr. Castillo's physical health and well-being from being in segregation so long on stacked sentences, without access to exercise or yard. But they recklessly disregarded that risk and failed to take any action to address his suffering.

128. Mr. Castillo grieved the denial of outdoor exercise and out-of-cell time, but his grievances were denied and the yard deprivation continued. In denying one such grievance, the counselor and grievance officer stated that yard was canceled "as an administrative decision due to staff shortage" and that "Menard CC has been running under level 2 lock down due to staff shortage." They also cited the IDOC directive permitting exercise deprivation during lockdowns in support of their denial of Mr. Castillo's grievance. During that time, Defendant Wills was Warden and Defendant Locke was Deputy Director.

129. Mr. Castillo filed grievances about out-of-cell time that were personally reviewed and then denied by Defendants Reichert and Wills. The denial of one grievance was ultimately approved by Defendant Hughes.

130. Mr. Castillo spent much of his time in the North 2 segregation unit on "C grade," which further restricted his out-of-cell time, compounding the harm of exercise deprivation.

**2. *Defendants Have Employed Other Policies and Practices to Deprive Plaintiffs of Exercise for Extended Periods of Time.***

**(a) Defendants deprived Plaintiffs of exercise and out-of-cell time through the practice of "pink tagging."**

131. Plaintiffs Johnson and Castillo were further denied recreation and out-of-cell time when Defendants placed them on "pink tag" status.

132. Upon information and belief, "pink tag" refers to IDOC Admin. Directive 05.03.107, which governs the "Special Placement Double Cell Assessment." The directive requires that individuals newly placed in restrictive housing undergo a security assessment to determine whether they can safely be double-celled.

133. With the knowledge and approval of Defendants Hughes and the Warden Defendants, Defendants at Menard have converted this policy into an informal long-term yard-restriction status to further punish segregated prisoners, including Plaintiffs, and deny them movement. On information and belief, this practice does not exist at any other IDOC prison and is not recognized by IDOC as a valid rule or regulation.

134. Mr. Johnson was placed on pink tag status and categorically excluded from yard even on the rare occasions when it was run for other people in segregation. He was also deprived of showers as a result of his pink tag status.

135. When Mr. Johnson attempted to grieve his placement on pink tag status, he was told "[t]he '[p]ink tag' is a requirement of AD 05.03.107 and authorized by the current Director."

Defendant Wills was the Warden at that time. Defendant Hughes was the Director. Pink tag status thus operated as an unreviewable administrative tool to deny Mr. Johnson exercise indefinitely, with no clear criteria for removal and no avenue for challenge.

136. Mr. Castillo was also subjected to Menard's pink tag status, and as a result, was denied yard access for extended periods of time. Pink tag status is purportedly limited to 30 days but in Mr. Castillo's case it was imposed for longer.

137. When Mr. Castillo filed grievances regarding his pink tag status, the facility simply responded that he "was placed on orientation status upon his arrival to Menard CC." The facility also stated that Mr. Castillo was then "under a review for double celling which restricts his movement." As with Mr. Johnson, with Defendant Wills' knowledge and approval, correctional officers used pink tag as a pretext to deny Mr. Castillo yard and shower access. When Mr. Castillo attempted to grieve these restrictions, he was told they could not be grieved.

**(b) The harms to Plaintiffs from exercise deprivation were exacerbated by Defendants' constant administrative lockdowns.**

138. Lockdowns at Menard have become the norm in recent years. From September 2023 through May 2026, Menard instituted facility-wide lockdowns nearly every day, totaling 970 days—or 97% of the time—in a less than three-year-period.

139. A "lockdown" is a procedure that suspends facility operations. During a lockdown, prisoners are confined to their cells, sometimes for extended periods of time. They are denied yard and other movement, deprived of human interaction, and subject to extreme isolation.

140. Defendants, including the Warden Defendants and Defendants Locke and Greene, utilized non-emergency, administrative lockdowns as a routine operational practice rather than a temporary and exceptional measure.

141. Emergency lockdowns are instituted in "response to critical incidents or intelligence reports of imminent threat to the normal operation of a facility, warranting immediate action." IDOC Admin. Directive 05.01.301(II)(E).

142. The majority of the lockdowns at Menard are non-emergent and administrative in nature. They are not instituted for genuine security purposes or for the protection of prisoners or staff.

143. In the last fiscal year, from July 2025 through May 2026, Menard was on full lockdown all but eight days. Only seven were emergency, incident-based lockdowns.

144. Lockdowns are initiated by the Warden, who then must provide regular updates to the Deputy Director.

145. Defendant Locke and the then-Chief of Operations were responsible for approving all non-emergency lockdowns at Menard from April 2022 to December 2025.

146. Defendant Greene and Defendant Locke, who later moved into the role of the Chief of Operations, have been responsible for approving all non-emergency lockdowns at Menard from December 2025 to present.

147. IDOC Admin. Directive 05.01.301 defines three levels of lockdown with standard expectations for permissible movement during each level.

148. For Level I and Level II lockdowns, the Chief Administrative Officer—Defendant Wills and subsequently Defendant Plummer—may approve any deviations to program and movement restrictions, including out-of-cell recreation, with approval by the Deputy Director, Defendant Locke.

149. Out-of-cell recreation can continue as normal during Menard's Level III lockdowns, as determined and authorized solely by the Chief Administrative Officer.

150. Most lockdowns at Menard over the last two years have been Level III lockdowns.

151. The Warden Defendants and Deputy Director Defendants had the authority to ensure the Plaintiffs received yard time and out-of-cell recreation, regardless of Menard's lockdown status.

152. When Plaintiffs complained of spending months in confinement without receiving any yard time, Defendants replied that yard was not required during lockdowns.

153. Defendants have used lockdowns as a pretext to deprive Plaintiffs and other prisoners of yard and other out-of-cell time, including commissary and visits.

**(c) Defendants enforce an unconstitutional provision of the Illinois administrative code governing the restriction of recreation during lockdowns.**

154. In imposing near-constant administrative lockdowns at Menard, including in North 2, Defendants have acted partly pursuant to a state regulation governing out-of-cell recreation for people on segregation status within IDOC. This provision, 20 Ill. Admin. Code § 504.670(g), provides that "[r]ecreational opportunities shall not be required during institutional lockdowns or during institutional emergencies, including, but not limited to, riots, strikes, fires, work stoppages, power outages and natural disasters."

155. This regulation is facially unconstitutional because it authorizes Defendants to indefinitely deny segregated prisoners recreation and thus the right to exercise, which is a basic human necessity protected by the Eighth Amendment. The regulation places no temporal limit on the restriction on recreation and gives Defendants unfettered discretion to deny recreation in non-emergency situations.

156. There is no legitimate justification for suspending all recreation for people in restrictive housing during an administrative institutional lockdown, as these non-emergency lockdowns are not related to the safety and security of the institution.

157. Defendants know that by enforcing the regulation and repeatedly cancelling all recreation during routine administrative lockdowns, they are denying segregated prisoners their fundamental right to exercise, putting them at serious risk of significant physical, mental, and emotional harm.

158. There is no circumstance in which it would be constitutional for Defendants to indefinitely deny recreation to any prisoner during an administrative lockdown without a security or safety justification as is permitted by the regulation.

159. The regulation is also unconstitutional on an as-applied basis. Defendants' application of this regulation to Plaintiffs deprived them of their fundamental right to exercise without a genuine safety and security justification. By enforcing the regulation as to Plaintiffs, Defendants recklessly disregarded a serious risk of harm to their health.

160. Defendants' deprivation of the Plaintiffs' right to exercise based on this unconstitutional regulation has led each of them to suffer extreme physical and psychological harm.

### C. In-Cell Exercise is Nearly Impossible Due To the Size, Layout and Squalid Conditions of the Cells in North 2.

161. Defendants are or were personally responsible for ensuring that conditions in North 2 meet the minimum standards necessary to support the physical well-being of the people who live there. Defendants have repeatedly failed to meet their obligations. As a result, Plaintiffs were forced to suffer in deplorable conditions that impeded them from engaging in even basic movement, much less meaningful exercise.

162. The physical plant at Menard is old and dilapidated, and these poor conditions are particularly extreme in the North 2 segregation unit.

163. North 2 segregation cells are extremely small and narrow. The estimated size of Mr. Johnson's cell in N2 in February 2026 measured approximately 5 feet by 11 feet. Some cells at Menard are less than five feet across. The cells generally contain a bunk bed or single bed, a desk, a toilet, and a sink. Plaintiffs barely had any open space in their cells.

164. North 2 segregation cells fail to meet the ACA minimum size of 80 square feet. On information and belief, some cells fail to meet even the Illinois statutory minimum size of 50 square feet.

165. Mr. Johnson is five feet, nine inches tall. Mr. Johnson's shoulders brushed up against the wall and the side of his bunk when he attempted push-ups, and he could not complete a full jumping jack. Mr. Johnson obtained cuts on his elbows from the rusty bunk bed when attempting to work out in the confined space.

166. Mr. Jones is six feet tall and could touch both walls of his cell simultaneously without fully extending his arms. The cell floor was the only area available for exercise, but Mr. Jones could not complete a full push-up without his elbows hitting the bunk. His elbows struck the bunk or the walls if he attempted upper-body movement. These conditions made in-cell exercise not only infeasible but also physically dangerous.

167. Mr. Castillo is five feet, eleven inches tall. He could not fully extend his limbs in his N2 segregation cell, making any meaningful exercise physically impossible. Mr. Castillo could not perform exercises such as push-ups or stretches without striking the walls or the bunk.

168. The fronts of North 2 segregation cells are either made of solid metal, open bars, or open bars covered with plexiglass. Mr. Jones and Mr. Johnson have been confined in each of these types of cells. Mr. Castillo has been confined in cells with solid metal and open bar fronts.

169. Solid metal and plexiglass fronts do not allow fresh air to circulate in the cell, eliminating ventilation and creating conditions in which physical exertion risks respiratory distress—particularly for Mr. Johnson, who has diagnosed asthma.

170. Smoke from other residents' substance use seeps into these cells and does not dissipate due to the lack of air circulation. Mr. Johnson was forced to inhale smoke. And without any access to the outdoors, Mr. Johnson had no means of breathing clean air, which exacerbated his respiratory condition and made it even more difficult for him to exercise in his cell.

171. When Mr. Johnson was confined in one of the plexiglass cells for just one day, he felt sick and experienced shortness of breath due to inadequate ventilation. The suffocating conditions made him feel like he was inside an oven. The lack of air circulation made it more difficult—and dangerous—for Mr. Johnson to even attempt to exercise in his cell.

172. In the North 2 segregation unit, all Plaintiffs were subjected to extreme temperatures. In winter, there was no heating, and they could see vapor from their breath inside their cells. In summer, there was no air conditioning or other ways to cool down, and they languished in suffocating, dangerous heat. These conditions made physical exertion hazardous.

173. Plaintiffs' cells in North 2 segregation were filthy, dank, and dilapidated. Vents were often clogged with dust and dirt. The cells reeked of feces, urine, and smoke. The floors and walls were covered in black mold, particularly around the toilets and vents, making floor exercises unsanitary and hazardous to respiratory health.

174. Mr. Jones' cells in N2 did not have any windows and were not situated near any windows, leaving him in a stifling, dark environment with stale, unmoving air. Mr. Jones went nearly a full year without seeing the sky or natural light.

175. The following pictures depict cells in North 2 segregation like the cells Plaintiffs were housed in, some with bars and others with solid doors.

---



Menard Correctional Center - Cell with solid door with feed box



Davis v. Baldwin USDC-SD IL 16-600
0349219

Attorney's Eyes Only

0349219

Menard Correctional Center - Double celled open bar restrictive housing cell



Davis v. Baldwin USDC-SD IL 16-600 0349224

Attorneys Eyes Only

0349224

176. On information and belief, Gallery 5 contains crisis watch cells for people in restrictive housing, although there are often so many people on crisis watch that they are placed in overflow cells. Between June 2025 and May 2026, six people committed suicide in restrictive housing across IDOC. Four of those people were at Menard.

177. The crisis watch cells in North 2 are as claustrophobic and crammed as standard N2 segregation cells. Mr. Johnson was confined to a crisis watch cell like the one pictured below for 6 days. When Mr. Johnson was in his crisis cell, physical exercise and movement were impossible.




CONFIDENTIAL - ATTORNEYS EYES ONLY

178. Despite the squalid conditions, correctional officers often did not provide Plaintiffs with cleaning supplies. The unsanitary conditions made it dangerous to attempt to exercise in the narrow space.

179. The cleaning supplies that correctional officers would distribute came in the form of one milk carton's worth of bleach-water. While in N2 segregation, Mr. Castillo received this ration occasionally; Mr. Johnson received it only once.

180. Frequent flooding in the housing unit—which sometimes contained feces or urine—seeped into Mr. Jones' cell. He was forced to use his own jumpsuit to plug the bottom of the door and to use cardboard to push the dirty water out.

181. Correctional officers cut off water lines to cells in North 2 segregation as a form of punishment. When this occurred, Plaintiffs were sometimes not even able to flush the toilet, worsening the unsanitary cell conditions and further making exercise in their cells a practical impossibility.

182. In North 2, Mr. Johnson often did not receive an adequate amount of drinking water, leaving him dehydrated and physically weakened. The only water Mr. Johnson received came from the sink. When the water line was cut, his only source of hydration was the frequently spoiled milk or juice that came with his meal. The milk regularly caused him stomach problems. Around the beginning of 2026, IDOC switched to just providing powdered milk. Without adequate hydration, particularly in the hot summer months, exercise becomes dangerous, as it risks severe dehydration, heat exhaustion, and other serious health consequences.

183. In the North 2 segregation unit, Plaintiffs received an insufficient amount of food that left them hungry. The food (including meat) was often undercooked; the baked chicken was often referred to as "the pink bird" because it was pink on the inside. Inadequate nutrition contributed to Plaintiffs' physical deterioration and further impeded their abilities to exercise.

184. Defendants also denied Plaintiffs access to property that could provide mental stimulation and minimally offset the effects of exercise deprivation and immobility. For the first few weeks of their time in segregation, they were not provided access to books, magazines, legal mail, and other personal property.

### D. Defendants Have Long Been on Notice that Their Restrictive Housing Practices Risk Substantial Harm to the People in Their Custody and thus Violate the Law.

185. Defendants have been on notice for at least fifteen years that the deprivation of exercise and out-of-cell time violates the Eighth Amendment, Illinois law, IDOC policies, and correctional standards, and risks grave harm to the people confined in North 2.

186. As the chief administrators of IDOC and Menard, respectively, Defendant Hughes and the Warden Defendants are and were responsible for ensuring that policies and legal requirements concerning restrictive housing and out-of-cell time are implemented and followed at Menard, including by the Assistant Warden Defendants.

**Illinois Law & IDOC Policy**

187. Under IDOC policy, in accordance with Illinois law, out-of-cell recreation may be temporarily restricted or suspended if the Chief Administrative Officer (*i.e.*, Defendant Plummer or Wills) "determines the activity to be a threat to the safety and security of the facility or any person." IDOC Admin. Directive 05.15.100(II)(J)(3)(b); *see* 20 Ill. Admin. Code §§ 504.670(b). The type, duration, and reason for any such restriction must be documented for each individual, and the restriction shall only stay in effect until the safety or security concern can be mitigated. IDOC Admin. Directive 05.15.100(II)(J)(3)(b)(1); 20 Ill. Admin. Code § 504.670(d).

188. IDOC policy also requires that prisoners' medical and mental health must be taken into consideration regarding their placements in restrictive housing and restrictions on out-of-cell time. Out-of-cell time may not be restricted if there is a medical or mental health contraindication. IDOC Admin. Directive 05.15.100(II)(J)(3)(b); 20 Ill. Admin. Code § 504.670(b). Under no circumstances shall mentally ill individuals in ERH for over 60 days be provided less than the required ten hours of structured and ten hours of unstructured out-of-cell time per week. IDOC Admin. Directive 05.15.100(II)(J)(3)(b).

189. When an individual's out-of-cell recreation is restricted for more than 90 consecutive days, "the restriction and any health concerns shall be reviewed and approved in writing by an Assistant Warden or above (no designee)." IDOC Admin. Dir. 05.15.100(II)(J)(3)(b)(2); *see* 20 Ill. Admin. Code § 504.670(e).

190. As described above, Defendants have deprived all Plaintiffs of recreation and out-of-cell time in blatant disregard of these Illinois laws and IDOC policies.

**Audits and Investigations**

191. In 2011, IDOC commissioned two assessments of prison conditions by outside experts, both of which examined the Department's use of restrictive housing. The first review was conducted by Fred Cohen, a nationally recognized authority on correctional law, and focused on IDOC's treatment of incarcerated individuals with mental illness, including those subjected to restrictive housing. Cohen's report documented severe and pervasive harm experienced by people in IDOC's restrictive housing.

192. The second review was conducted by the Vera Institute of Justice and led by corrections expert Dr. James Austin. Its report concluded that IDOC's reliance on solitary confinement reflected a punitive approach rather than a rehabilitative one, and that conditions in restrictive housing were degraded. These conditions included limited opportunities for recreation, restricted access to showers, inadequate mental health services, and minimal interaction with clinical staff—circumstances the Vera team found inconsistent with accepted national standards.

193. In 2024, the Illinois prison watchdog organization, John Howard Association (JHA), issued its monitoring report about Menard. It highlighted the prison's "near total lockdown conditions" (almost every day for a year starting in September 2023) which eliminated movement opportunities—including meals, showers, yard, and recreation. JHA noted that in the restricted housing units, there was "universal reporting of not getting time out-of-cell or yard access" for months at a time. The organization found that individuals with disciplinary restrictions "were not getting any yard." JHA called these conditions "inhumane" and recommended that administrators—*i.e.*, the Defendants—review out-of-cell time in the restrictive housing units.

194. In 2025, JHA released a survey of Menard prisoners. The survey asked if people were getting at least two hours a day out of their cell. Two-thirds of respondents said no. Over 80% of respondents said people in the prison spent too long confined to their cells and 75% of respondents stated that people in the prison were often locked down. While on lockdown, people in the prison were confined to cells that 82% of respondents said were poorly ventilated and 73% felt were an uncomfortable temperature. The survey also revealed that significant percentages of prisoners were not getting access to programming, including school or work, or other movement.

195. Both expert teams and JHA communicated their conclusions and recommendations directly to IDOC officials, including the Defendants. They emphasized the seriousness and urgency of the harms associated with restrictive housing. Despite such notice, IDOC and Menard leadership, particularly Defendant Hughes and Defendants Wills and Plummer, failed to implement necessary reforms at Menard, allowing unconstitutional practices to persist.

**Litigation**

196. Defendants were further placed on notice of problems with their exercise and out-of-cell time policies through litigation. Over the past five years, there have been at least nine lawsuits against Defendants by people confined in North 2 complaining they were unlawfully deprived of yard and out-of-cell time.

197. One plaintiff stated he was housed in North 2 from August 22, 2024 to December 11, 2024—111 days—without any out-of-cell time. *Gerken v. Wills*, No. 25-CV-998, 2025 WL 2083340, at *1 (S.D. Ill. July 24, 2025). As recently as December 2025, this court found a plaintiff stated a colorable Eighth Amendment claim against Defendants for denying the plaintiff all out-of-cell exercise for six months. *Brooks v. Wills*, No. 25-CV-01651, 2025 WL 3706379, at *3 (S.D. Ill. Dec. 22, 2025).

198. Defendants Wills, Hughes, Reichert, and Locke are named in and actively litigating at least five of these cases. Defendant Wills responded to a claim about lack of yard access as recently as February 2026 and Defendants Wills, Reichert, and Locke have two substantive pleadings due in similar cases in early July 2026. In the last five years, Defendant Wills settled at least two similar cases and briefed motions for summary judgment in five others. Defendant Hughes briefed a motion for summary judgment in April 2026 and was named in at least one other action about lack of access to yard.

199. In 2016, individuals held in restrictive housing at IDOC facilities, including Menard, filed a state-wide injunctive class action complaint challenging the abhorrent conditions of confinement in restrictive housing within IDOC. That case, *Davis v. Hughes*, proceeded to trial in October 2025.

200. In 2018, as part of the *Davis* litigation, Eldon Vail, a former correctional administrator with decades of experience, evaluated IDOC's restrictive housing units, including at Menard, and concluded that the conditions fell far outside accepted correctional norms. Mr. Vail's report in the *Davis* litigation found that out-of-cell and yard conditions fail to meet national and international standards.

201. In 2019, also in *Davis*, solitary confinement expert Professor Craig Haney submitted a report detailing the well-established psychological harms of solitary confinement, explaining that movement is required for humans to maintain healthy functioning and that the near-total lack of movement and exercise experienced in restrictive housing puts prisoners at risk of serious mental harm.

202. In 2023, Dan Pacholke, a former correctional administrator and expert in *Davis*, evaluated the conditions at multiple restrictive housing units, including at Menard, and concluded

that the out-of-cell and yard conditions did not improve since Mr. Vail's report and that they continued to violate national and international standards.

203. Defendants Hughes received each of these expert reports. She also testified in the *Davis* trial for the Department that she was aware of the Vera Institute study and its recommendations. She knew of the study's conclusion that extreme isolation produces severe and well-documented psychological harm, particularly in correctional settings.

**Grievances**

204. The individual Plaintiffs have also each placed Defendants on notice of the unlawful nature of their conduct by filing grievances concerning the deprivation of yard time and exercise. Defendants Plummer, Wills, and Reichart have denied multiple such grievances submitted by Plaintiffs. Defendant Hughes signed the denials of Plaintiffs' appeals of those grievances and approved of the institutional response, including when the response stated that yard was "not deemed essential."

205. On information and belief, Defendants have received scores of similar grievances about lack of out-of-cell and yard time from other N2 prisoners over the past two years.

**Corrections Experience**

206. Each Defendant is a long-time correctional employee and in a position of leadership. They have toured restrictive housing units, including at Menard. They have spoken to prisoners who reside in North 2.

207. Defendants have responsibility for overseeing the implementation of restrictive housing policies. They have the training and experience to know that isolating prisoners in cells in subpar conditions with no access to exercise creates a substantial risk of harm and is likely violative of prisoners' constitutional rights.

**E. Plaintiffs have Suffered Serious Physical and Mental Harm as a Result of Defendants' Policies and Practices of Exercise Deprivation.**

208. As a direct and proximate result of the Defendants' policies and practices, including the denial of exercise and out-of-cell time in the North 2 segregation unit, Plaintiffs have suffered serious physical harm, including significant weight loss, muscle atrophy, and joint pain.

209. Each has also suffered deterioration to their mental health, including depression and anxiety. Despite that, none of the Plaintiffs were able to access adequate mental health services to address the harm caused by isolation and lack of movement.

**Omar Johnson**

210. Mr. Johnson's physical health has suffered greatly due to his inability to move and exercise his body. A month into his initial placement in North 2, Mr. Johnson began experiencing pain and stiffness in his joints.

211. With continued deprivation of exercise and out-of-cell time, Mr. Johnson's joints and lower back tightened, and he suffered a compressed disc. For Mr. Johnson, who has been an athlete his entire life, the inability to exercise is a particularly painful deprivation that takes away his primary coping mechanism and means of physical self-care.

212. Mr. Johnson is depressed, irritable, and stressed as a direct consequence of being stuck in a cell 24/7 without exercise or meaningful human contact.

213. Mr. Johnson has been diagnosed with an unspecified anxiety disorder. His mental health treatment plan calls for weekly group therapy and individual sessions, but he has not received this treatment.

214. Without yard time or group therapy, Mr. Johnson has no structured outlet for the psychological distress caused by his isolation.

215. Compounding the stressful environment of lockdown conditions in North 2, Mr. Johnson is subjected to the rampant racism of Menard's correctional officers, who openly call him racial slurs and threaten racially motivated violence against him. For instance, during the December 2025 cell extraction that precipitated his current segregation term, a correctional officer told Mr. Johnson: "I'll kill you, you fucking n****r." This treatment has worsened his mental state and exacerbated the stress that has resulted from being deprived of exercise and movement.

**Clarence Jones**

216. Mr. Jones has suffered severe and progressive physical and mental health deterioration, including depression and anxiety, after spending 356 days in isolation and total deprivation of exercise.

217. Mr. Jones lost a significant amount of body weight during his year in North 2. The weight loss resulted from a combination of depression, muscle atrophy, and the lethargy that accompanied prolonged immobility in a confined space with almost nothing to do but lay in his cell and sleep. Upon release from segregation, Mr. Jones's clothing was too loose on his body.

218. Mr. Jones also suffered serious back and neck pain. A nurse prescribed him pain medication and a muscle relaxant and ordered physical therapy, an MRI, and an X-ray. But his physical therapy sessions were frequently cancelled. The unsanitary conditions in which Mr. Jones was held, compounded by the frequent denial of showers, caused rashes on his body. A nurse practitioner documented a persistent fungal rash wrapping around his chest and neck.

219. Mr. Jones has struggled for years with anxiety and depression. His mental health deteriorated significantly during his 356-day period of isolation in North 2, during which he received no psychotropic medication or mental health counseling.

220. Several people died in North 2 during the year Mr. Jones was held there, which worsened his depression and anxiety. Mr. Jones felt completely hopeless in the face of the cruel and inhumane conditions at Menard. His sense of hopelessness was compounded by the repeated denial of his grievances, which were his only means of seeking help.

221. Mr. Jones was called to group therapy only twice during the entire year he spent in North 2, a further limitation on his out-of-cell time.

222. Mr. Jones repeatedly complained of not being seen by a mental health counselor despite his prolonged confinement, but he was not assigned a mental health professional until after his release from segregation, at which point he had only a single meeting. Consequently, despite decompensating from isolation and lack of exercise, he received no mental health treatment.

**Alex Castillo**

223. Mr. Castillo has suffered severe and progressive physical deterioration as a direct result of his prolonged isolation and near-total deprivation of exercise. Mr. Castillo lost a significant amount of body weight during his time in segregation, resulting primarily from loss of muscle mass due to the lack of movement.

224. Mr. Castillo suffers from chronic arthritis for which he receives injections every two weeks. The exercise deprivation has significantly exacerbated his arthritis. Mr. Castillo's shoulders burned and locked up, and he had difficulty walking around even within his cell.

225. Mr. Castillo has also experienced severe mental health deterioration because of his prolonged isolation and deprivation of exercise. He has suffered from panic attacks, depression, insomnia, and loss of appetite.

226. When he was briefly released into East House after two years of segregation in N2, Mr. Castillo experienced intense anxiety from being around people, evidence of the profound

psychological damage caused by prolonged isolation. Regular outdoor exercise and access to out-of-cell activities would have reduced the negative impact of solitary confinement on his mental health.

227. Despite his deteriorating mental health, and like Mr. Jones and Mr. Johnson, Mr. Castillo was also unable to access meaningful mental health services. Although he repeatedly requested one-on-one sessions with mental health professionals, it took approximately nine months after his initial placement in segregation to receive a one-on-one session—the only one he has received in the past three years.

## CLAIMS FOR RELIEF

### Count I

***42 U.S.C. § 1983 – Violation of the Eighth Amendment, Conditions of Confinement***

228. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

229. Defendants Hughes and Plummer are sued on this count both in their official and individual capacities. All other Defendants are sued on this count in their individual capacities only.

230. This count is brought on behalf of all Plaintiffs.

231. The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment, including conditions of confinement that deprive incarcerated individuals of the minimal civilized measure of life's necessities.

232. Exercise is a recognized basic human need. Its prolonged deprivation, particularly in combination with extreme isolation and deplorable cell conditions, constitutes cruel and unusual punishment.

233. By their policies and practices—including the deprivation of yard and out-of-cell time, stacked discipline, continuous administrative lockdowns, and pink tagging—Defendants have deprived Plaintiffs of their ability to exercise and engage in movement inside and outside of their cell.

234. Defendants have caused Plaintiffs to be held in total confinement in tiny, unventilated, and unsanitary cells, while denying them access to yard or outdoor recreation, gym, group therapy, mental health services, religious services, congregate meals, law library, barber shop, and other forms of meaningful movement. These conditions of confinement deprive Plaintiffs of the minimal civilized measure of life's necessities.

235. Defendants have also continued to enforce the unlawful regulations in 20 Ill. Admin. Code § 504.670, which permits them to cancel all recreation for Plaintiffs and any North 2 prisoners during non-emergent administrative lockdowns.

236. Defendants' policies and practices resulting in Plaintiffs' long-term deprivation of exercise and out-of-cell time are inconsistent with current American standards of decency and with prevailing state and national correctional standards governing the right to exercise and out-of-cell time.

237. As a direct and proximate cause of Defendants' policies and practices, Plaintiffs have suffered serious harm, including physical and psychological deterioration, unhealthy weight and muscle loss, chronic pain, depression, anxiety, and despair.

238. There is no actual safety or security justification for Defendants' policies and practices, which serve only to undermine Plaintiffs' physical health, well-being, and safety.

239. Defendants know of the substantial risk of serious harm that prolonged exercise and movement deprivation posed to Plaintiffs' health, well-being, and safety. They have been put

on notice of the serious risks through Illinois law and IDOC policy, past and on-going litigation, expert evidence, reports, audits, and grievances, as well as by physical observation during tours of the Menard N2 unit and by their own long-time experience as correctional professionals. Through their review of Plaintiffs' placements in ERH and their roles and involvement in the grievance process, Defendants also knew that Plaintiffs were deprived of exercise and movement for prolonged periods of time.

240. Illinois law and IDOC policy are clear that Plaintiffs were required to have received yard and recreation time out of cell while in the N2 segregation unit.

241. Defendant Hughes is the lead defendant in the statewide *Davis v. Hughes* class action. The suit raised expert evidence about the physical and mental harms caused by solitary confinement practices, including from the lack of out-of-cell time that Plaintiffs suffered here.

242. Defendant Hughes is also personally familiar with the Vera study which put the IDOC on notice over 10 years ago about the dangers of restrictive housing.

243. Defendants Hughes, Willis, and Plummer have received recent official reports and audits from the JHA which describe the harm caused by their restrictive housing practices and their lockdown practices, including at Menard.

244. Defendants have been sued repeatedly for depriving people in Menard, including in N2 segregation, of exercise and out-of-cell time.

245. Plaintiffs each filed numerous grievances complaining of their deprivation of exercise and out-of-cell time, all of which were denied. Defendants Hughes, Plummer, Wills, and Reichert reviewed and signed off on their denial.

246. The substantial risk caused by the Defendants' policies and practices was also obvious to the Defendants, who are all experienced corrections professionals, as they would be obvious to any reasonable person.

247. Based on their roles and involvement in the grievance process, review of prisoners' placements in ERH, and use and/or approval of near-constant non-emergency, administrative lockdowns during which out-of-cell time was denied, Defendants knew of the substantial risk of harm that their extreme policies and practices would cause Plaintiffs.

248. Despite knowing that their policies and practices depriving Plaintiffs of exercise created a substantial risk of harm, Defendants did not reduce or eliminate those risks. Defendants have thus acted recklessly and with deliberate indifference toward Plaintiffs.

249. Mr. Johnson seeks injunctive relief against Defendants Hughes and Plummer in their official capacities, and in particular, an order requiring that Mr. Johnson be kept out of North 2, housed in general population, and provided daily out-of-cell exercise and weekly out-of-cell time consistent with IDOC policy and correctional standards.

250. Mr. Johnson was housed in N2 segregation at the time of the original complaint in this matter. Mr. Johnson will incur serious harm unless Defendants are enjoined by this Court from committing further violations of the Eighth Amendment.

251. Mr. Johnson also seeks a declaration against Defendants Hughes and Plummer in their official capacities that the terms of 20 Ill. Admin. Code § 504.670 permitting the unrestricted denial of recreation during non-emergency administrative lockdowns for those in restrictive housing without a safety or security justification is unconstitutional under the Eighth Amendment, on its face and as-applied to him.

252. All Plaintiffs seek a declaration against all Defendants in their individual capacities that the terms of 20 Ill. Admin. Code § 504.670 permitting the unrestricted denial of Plaintiffs' recreation and yard during non-emergency administrative lockdowns without a safety or security justification is unconstitutional under the Eighth Amendment, as-applied to all Plaintiffs.

253. All Plaintiffs seek a declaration against the Defendants in their individual capacities that the Defendants' policies and practices depriving Plaintiffs of the fundamental right to exercise as described herein constitute cruel and unusual punishment in violation of the Eighth Amendment.

254. All Plaintiffs seek compensatory damages against Defendants in their individual capacities to remedy the past violations of their Eighth Amendment rights as described herein.

255. All Plaintiffs also seek punitive damages against Defendants in their individual capacities. By denying the Plaintiffs access to a fundamental need essential to their physical and mental well-being, knowing the harm they were causing, they have evinced callous and reckless disregard for Plaintiffs' federally protected civil rights.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiffs respectfully request that the Court:

a. As to Plaintiffs' claims for declaratory and injunctive relief:

i. Enter judgment on behalf of all Plaintiffs against all Defendants in their individual capacities declaring that exercise is a fundamental right, and that the Defendants' policies and practices resulting in the deprivation of exercise and movement constitute cruel and unusual punishment and violated Plaintiffs' rights under the Eighth Amendment to the United States Constitution;

ii. Enter judgment on behalf of Plaintiff Johnson against Defendants Hughes and Plummer in their official capacities declaring that 20 Ill. Admin. Code

§ 504.670 permits the indefinite deprivation of recreation during lockdown without security justification and thus violates the Eighth Amendment on its face and as applied to him;

iii. Enter judgment on behalf of all Plaintiffs against Defendants in their individual capacities, declaring that 20 Ill. Admin. Code § 504.670 permitted the indefinite deprivation of Plaintiffs' recreation during lockdown without security justification and thus violates the Eighth Amendment as applied to Plaintiffs;

iv. Enjoin and restrain Defendants Hughes and Plummer, in their official capacities, as well as their officers, agents, servants, employees, and all persons acting in active concert or participation with them, from denying Plaintiff Johnson his constitutional right to exercise;

b. As to Plaintiffs' monetary claims against Defendants in their individual capacities,

i. Award Plaintiffs compensatory damages in an amount to be proven at the time of trial for the conduct alleged in this Complaint, including an award for each day Plaintiffs were unconstitutionally deprived of exercise and out-of-cell time in the North 2 segregation unit;

ii. Award punitive damages against Defendants for their reckless and callous conduct, sufficient to deter further wrongdoing;

c. Award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d. Grant such other further relief as the Court deems just and equitable.

DATED: July 13, 2026

Respectfully Submitted,

**MACARTHUR JUSTICE CENTER**

*/s/ Alexa Van Brunt*
Alexa Van Brunt
Jessica Gingold
Danielle Berkowsky
Noor Tarabishy
Olivia Fritz
MacArthur Justice Center
160 East Grand Avenue
Chicago, IL 60611
Telephone: 312-503-1336
alexa.vanbrunt@macarthurjustice.org
jessica.gingold@macarthurjustice.org
danielle.berkowsky@macarthurjustice.org
noor.tarabishy@macarthurjustice.org
olivia.fritz@macarthurjustice.org

**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Avram E. Luft*
Avi Luft (admitted *pro hac vice*)
Sean Nolan (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-8148
Facsimile: (212) 872-1002
aluft@akingump.com
snolan@akingump.com

Fatima Bishtawi (*pro hac vice* pending)
100 Pine Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 765-9500
Facsimile: (415) 765-9501
fbishtawi@akingump.com

*Attorneys for Plaintiffs Omar Johnson, Clarence Jones, and Alexander Castillo*